And the next case is Africa Growth Corporation versus the Republic of Angola. Jeffrey Harrison is here for the appellant, Africa Growth. Andrew Swartz is here for the Republic of Angola. And Mr. Harrison, you may begin when you're ready. May it please the court, my name is Jeffrey Harrison. I represent appellant, Africa Growth. We ask this court to reverse and remand. This lawsuit is based upon Angola's commercial activity of breaching the 2019 litigation settlement agreement, not Angola's involvement three years earlier in General Andrade's illegal seizure of property. This court's Foreign Sovereign Immunities Act breach of contract cases like Devon Goetia, Wavera, Peru, Samco, and Honduras Aircraft Control, not the Beg versus Pakistan expropriation case. Why not? Seems to be pretty much on point, Beg versus Pakistan. We held there that the, quote, agreement to compensate, close quote, for an expropriation is a sovereign act because such an agreement is not the type of activity in which private actors engage, nor is it a market transaction, period. Beg leaves wide open, Foreign Sovereign Immunities Act commercial activity exception jurisdiction for foreign states when they're sued for breach of contract. In Beg, the pro se plaintiff below and on appeal sued only for expropriation. He did not allege the existence of a contract or the breach of a contract. In fact, this court rejected Beg's suggestion by analogy that he had, quote, the equivalent of a contract with Pakistan to compensate him. Beg did not allege any contract at all. Beg's damage in that case that he sought was for the expropriated value of the land, not for the value of the unconsummated land swap, different land, the supposed compensation. In Beg, Pakistan admitted that it expropriated Beg's land. Here, Angola denies it. Indeed, the DC circuit, the DC court below found, quote, the taking of AFGC's property was not attributable to Angola. The sentence, Judge Wilson, that you read is a one sentence line from Beg. And I think that Angola is overreading that. Angola already decided whether and how to compensate AFGC for lobbying, lawsuit dismissal, and claims release, not for the taking that Angola denied the property was taken years earlier in 2016 by General Andrade, not in February 2019, three years later in the settlement agreement reached in Lisbon. Let me ask you something. Are there any cases that you can point the court to where jurisdiction was found to exist under FSIA based simply on the breach of a settlement agreement where the injury was pursuant to a sovereign public power? In Devon, Goetia, Judge Rosenbaum, in her opinion, relied heavily and appropriately on the DeCepel versus Hungary DC Circuit 2013 case. Judge Rosenbaum held that? Did I say hold? She embraced it. She embraced it and found it materially indistinguishable, I believe was the precise term. You're going to get me into trouble up here with these guys. I like these guys. I like the trouble. Because we need to explore these issues and understand why Angola relies so heavily and improperly on Beg, like a wild dog crying out in the night with apologies to Toto's 1982 song, Africa. It made no difference under the FSIA that Nazi-era Hungary had expropriated the Herzog collection, followed by a subsequent bailment decision years later. Whereas Venezuela possessed the Bolivar collection through a bailment contract, the DeCepel complaint is filled with allegations about Hungary's Nazi-era expropriation with the actual claims as discussed at page 598 of the opinion are based upon later breaches of bailment agreements. While expropriation is a uniquely sovereign act. I'm sorry to interrupt, but in Devon, Goetia there was no claim for expropriation. I mean, the Bolivarian Republic of Venezuela never alleged that it had taken the collection as an expropriation. And so that issue was removed from the case. In other words, any kind of thing that followed could not possibly have been the result of trying to settle or otherwise dispose of an expropriation claim. Entirely agree. And of course, Your Honor knows the opinion better than I, though I've enjoyed reading it many times. Thank you. But Judge, that's the point. The outcome in DeCepel, like the outcome in Devon, Goetia, turned on the existence and breach of a contract like a commercial player can enter into, not on the underlying expropriation. And by the way, as the court will remember, the original complaint did contain an allegation of expropriation. It did. It was later superseded, of course, by the amended complaint. But that's it. But that was an allegation of expropriation that was made by Devon, Goetia. It was never made by Venezuela. And that's sort of the distinction, I think. I believe it is a distinction without a difference. Based on the analysis of the DeCepel court and of Your Honor in Devon, Goetia, and, Judge Covington, to your question, back to other cases that apply in a breach of contract cases, I understood the question about expropriation. But looking at other uniquely sovereign underlying activity, this court in the Samco case found that where the underlying sovereign purpose is to maintain the military, it is still commercial activity where there is an alleged breach of contract. In Guevara, Peru, this court found that where there is unquestioned underlying sovereign activity of law enforcement in hunting down a fugitive and seeking information for it, the contract to pay $5 million for that information was breached, and that was commercial activity. In Honduras Aircraft, this court found that even though controlling your civil aviation is an unquestioned sovereign activity, the breach of contract alleged in Honduras Aircraft rendered this under FSIA commercial activity. Those cases are out of this court and are extremely compelling. And of course, all these cases are different. You've got Beg versus Pakistan. The decision conflicts with Guevara versus Peru. And I don't understand, why can't the court, and I understand we're reviewing the decision below De Novo, why can't the court just look at the purpose for entering in the contract in the first place, which is to resolve the expropriation rather than the nature of Angola's actions? Why can't the court, in each individual case, look at the purpose for entering into the contract? The U.S. Supreme Court would be most displeased, Judge Wilson, if this court did so. Because Weltover, Sachs, and Nelson all say that is exactly what courts cannot do. So there are three different prongs, right? There's the first one, which is based on. And I agree with you fully. On based on, Weltover, that's what it says. You can't look at the purpose. It doesn't matter why it's doing it. But then there's a second prong, or another prong, I guess, whether it's commercial activity. And I mean, I don't think you, and that's where you don't look at the purpose, as to whether it qualifies as commercial activity. Oh, I think that's not quite right, Judge. All right. In Weltover, the Supreme Court, in its 1992 case, tells us, quote, it is irrelevant why Argentina participated in the bond market in the manner of a private actor. It matters only that it did so, period, end quote, page 617. That was in the analysis of whether the conduct is commercial activity. This court's jurisprudence. I agree. That's what I'm saying, that you don't look at the purpose when it comes to whether it's commercial activity. But I don't think there's any, and I'm sorry. You're right. And this court has so held, by the way, squarely in Guevara versus Peru, page 1299, which we cite in the briefs, and where this court held, quote, the underlying activity at issue, the exchange of money for information, is commercial in nature, and of the type negotiable among private parties, period, end quote. And the court held, Judge Wilson, to your question, quote, paying an amount owed under a contract is not itself a sovereign act. The over-reliance that Angola improperly places on BEG ignores what we talked about earlier, and that is the complete absence in BEG of a contract or an allegation of breach. Something this court in BEG noted was absent and rejected an attempt to analogize. Why? Because it makes a difference. It is commercial activity. And in particular, this kind of contract, a contract to settle, in part, litigation, along with cessation of global lobbying and US lobbying, along with the release of claims and litigation, and along with payment of cash. You know, that raises some policy implications for our decision here. Isn't this act geared to protect foreign governments from liability? And so we would expect reciprocal treatment from foreign governments, wouldn't we? When there is indeed real sovereign activity at place. But when there is a settlement, like private parties can enter into a contract, this country would expect other courts, if they had jurisdiction, to exercise it and enforce contracts. Judge from a policy perspective, private litigants and the countries, and this country in particular, want courts, must want courts, to enforce their agreements. Otherwise, who's going to enter into them? How will they ever settle a piece of litigation? How will they ever do so, if they can't be trusted to do so? And on the point in particular that we have here, and I think also, Your Honor, Judge Covington, to your point about commercial activity and underlying sovereign nature. With respect to this kind of contract, ending litigation, the Fontana versus Argentina case out of the Second Circuit two years ago, tells us that that settlement with plaintiffs constitutes an act outside the territory of the U.S. in connection with commercial activity, even though the case involved, arguably, sovereign underlying claims. In U.S. versus Moat, the negotiation of contracts, including entry into a settlement agreement, clearly is the type of act performed by private persons. Page 1205. Not because there was an underlying other commercial contract, but because the settlement agreement itself was commercial. In Fagora versus Sweden, this is actually an excellent decision to read out of the Southern District of New York in 2016, because there, an embassy chauffeur sued for breach of his, quote, undoubtedly governmental employment with Sweden, and entered into a litigation tolling agreement with Sweden. The court found that litigation tolling agreement was FSIA commercial activity. Quote, it is irrelevant that the plaintiff's underlying employment relationship with the defendants was non-commercial in nature, because the tolling agreement was a distinct transaction that is commercial in nature. Page 317. And furthermore, quote, a tolling agreement creates enforceable rights between parties, and is the type of contract that private parties regularly enter into. Page 317. All right, we have your argument, Mr. Harrison. You've reserved some time for rebuttal. All those cases, Judge, all settlement litigation cases have been held commercial. Thank you. Thank you. Mr. Schwartz. May it please the court, Andrew Schwartz for the Republic of Angola. Is that the case, all settlement cases have been held commercial? No, but the settlement cases that have come up and been cited in this appeal make clear that the mode of analysis is to look at the underlying dispute. That's what Motes tells you. That's what Fontana tells you. Motes directly. We had a commercial dispute concerning the fabrication of electrostatic machinery for oil refineries culminating in a settlement that allegedly was breached. The Fifth Circuit there stressed that this was a commercial dispute. There was nothing sovereign about it. And so a claim for the breach of that settlement came within the definition of commercial activity. And that's the mode of analysis that should prevail. Fontana's the same thing, this recent Second Circuit case. There was, it's a little bit like the Vongochea in that Argentina in the Fontana case, just like Venezuela in the Vongochea, admitted that the underlying dispute was a commercial and the case involved an attempt on a part of an attorney to assert an attorney's lien on settlement proceeds. And the court found that was a commercial dispute because it arose itself from an underlying commercial dispute involving the failure to pay bonds. It couldn't be further removed from this case. Council, let me ask you a question though. This does seem like pretty close to De Sepul. How do you distinguish De Sepul? And obviously we're not bound by De Sepul, but I mean, it does seem like it's on point here. And so what is your principled distinction of De Sepul? De Sepul is very much like your decision in Vongochea. It involves a commercial bailment agreement that private parties could enter into. The key defining distinction between the situation at hand and De Sepul is as follows. And the court, the D.C. Circuit and De Sepul was at pains to point this out. The De Sepul plaintiffs did not allege that the bailment agreement there was entered into as a means of compensation for the World War II Europe. Here's the thing, I was looking closely at that because that was what I thought too when I recollected it. And then I went back and I looked at it and there's a separate analysis with respect to the commercial activity exception. And the court seems, at least to me, it doesn't use the words we're assuming without deciding or we're assuming for purposes of, but it seems like for purposes of the commercial exception, it was assuming that the paintings were expropriated. I mean, that's what it seems like to me when you read through that aspect of the opinion. I agree with you that the first part of the opinion, it's clear that the court is saying we're not deciding whether it was expropriated, et cetera. Because it says specifically, we don't have to reach that. But on the commercial part, it does seem like it's assuming that it was expropriated. I don't read the decision the same way and I've read it very closely and repeatedly. And there are several occasions in which the DC Circuit takes pains to emphasize that the bailment agreement there is not alleged to be a resolution of the World War II era expropriation. Here's what makes that very different, singularly different from our case. In our case, AFGC is at pains repeatedly, ad nauseum really, to plead that the settlement agreement here, just like in Begg, was a means of compensating for the alleged expropriation. That's what distinguishes the couple. Let me just point you to page, page 600 in the DeCepel opinion. And it says, nor does the fact that the Herzog collection was initially expropriated by the Hungarian government compel a contrary conclusion. To be sure, expropriation constitutes a quintessentially sovereign act falling outside the scope of the commercial activity exception. Here, however, the particular conduct upon which the family suit is based for purposes of the commercial activity exception is not the initial expropriate, okay, sorry, got the wrong part. But there's a part later, that's the first part that I was talking about. The later part then goes on to say that the, oh yeah, the expropriation is based on, sorry, is during the Holocaust, but instead Hungary's creation and repudiation of subsequently formed bailment agreements. The problem is in that particular part that I've quoted, the expropriation is assumed by the court. Although the court is saying that it's, that the conduct on which the family suit is based is the bailments that are repudiated later, it's assuming that there was an expropriation in the first place. That's the part that I'm talking about. No problem, absolutely no problem. You're pointing to the same passage, by the way, I was gonna read to you. All right. One of the several. I think that's a critical passage in the case. The point is, and the passage you're pointing to illustrates this vividly. The point is, unlike AFGC, the De Sapo plaintiffs did not allege that the bailment was a form of compensation for the World War II era expropriation. They had independent claims based on the bailment. Here, AFGC repeatedly and conspicuously alleges that the alleged settlement agreement was to compensate for the alleged expropriation. They also, though, allege that it's for the ceasing of lobbying activities worldwide. All of which was integrally and inextricably involved with the alleged expropriation. The so-called lobbying, if you wanna be charitable in characterizing it, concerned efforts to force Angola to pay for the alleged expropriation. It's all the same thing. This case really. If that's true, then, it seems like they would have sought to be compensated for the $55 million worth of seized property, rather than the $47.5 million breach of the settlement agreement. Well, they allege that there was a settlement. And they allege that there was a compromise. But it was still a settlement and a compromise of the claims for expropriation. And this lobbying was a means of trying to leverage the same result. Judge Wilson, I think you asked the right question at the outset of Mr. Harrison's argument. And I believe that the magistrate judge and the district judge got it right, because this case falls comfortably within the ambit of Begg. And it was properly dismissed by Judge Williams, because the case is not based on an act in connection with commercial activity. Begg teaches that a foreign government's failure to compensate for an expropriation does not fall under the commercial activity exception. This court in Begg made that unmistakably clear in the first paragraph of its decision. Begg has been outstanding for nearly 20 years. Don't you think the operative language is determining whether or how to compensate property owners for takings is also a sovereign function, not a market transaction? Yes, that's critically important language in Begg. And this was not a market transaction. This was not the type of alleged settlement agreement that a private party could enter into, because it was an alleged settlement of expropriation claims. Well, the problem with Begg, though, is that the conduct at issue there was strictly a governmental taking, involving a government's seizure of land without compensation. You know, I'm glad you asked about that, because Mr. Harrison, in his reply brief, made an argument about Begg that the trial counsel for AFGC didn't make, and nor did appellate counsel for AFGC make it in their opening brief. But they invited the court to look at the actual amended complaint of Begg that you can find on Pacer. But here, AFGC is only alleging breach of contract. They're not alleging an unlawful taking, which is what you had in Begg, though, right? Well, no, that's part of what you had in Begg. Begg alleged that there was a taking of the first parcel of property. He was supposed to receive the second parcel of property in return. And then Pakistan and Punjab, the regional government, didn't deliver the second parcel of property. But it's really, I'm glad that Mr. Harrison opened the door to this, because let me tell you what Begg actually alleged. Mr. Harrison stood up here today and said, Begg didn't allege a contract. Okay, you can find this complaint on Pacer just like we did. And it's cited in the AFGC reply brief. Here's what Begg actually alleged. Paragraph five of Begg's amended complaint. The government of Punjab, quote, negotiated and reached a contract with the plaintiff in Miami. Yeah, but the court found that there was no, in fact, it described it as an analogy and found that there wasn't really a contract. I mean, so that seems a little bit different. You know, I think I know exactly the passage of Begg you're referring to. And I think you need to read it in light of the amended complaint that's a matter of public record if you really want to get to the bottom of what the court was saying. I believe if you read the court, the passage in question in Begg, in light of what Begg actually alleged, and there were repeated references to an alleged contract in the Begg amended complaint. I think you really should take a look at it if you believe it would be helpful because it completely undermines AFGC's new argument. But if you look at that passage in Begg, what the court is saying is it doesn't matter if you call the agreement to exchange the property a contract or not. It doesn't matter because this was an agreement, as Judge Covington has suggested, to resolve a uniquely sovereign expropriation and only a sovereign can exercise the power to do that. That's not a private party transaction. That's not a market transaction. And call it a contract, call it an agreement, it doesn't matter what you call it. It's not commercial activity. Let me, I'm sorry, finish up. Make no mistake about it. Begg repeatedly made allegations of a contract, an undertaking, an agreement to compensate him for his expropriated property that the government of Punjab promised and agreed to provide compensation that the plaintiff entered into an agreement allowing defendants to occupy the land in exchange for other land. The Begg amended complaint is replete with allegations that there was a contract. But again, the point there is that the court said it was an analogy. It didn't recognize that there was an actual contract. Here, there is an allegation of an actual contract. But let me take you back for a moment to DeSeppel because the thing that I'm interested in and the point I was trying to make and that I'd like you to address is that it seemed to me in DeSeppel's discussion of the commercial activity exception that it was saying that even though the bailments were basically, even though the bailments came as a result of the expropriation, the allegation here is that the bailments are what is being violated. And that's really where the cause of action is coming from. And so I'm wondering why it would be that this case is distinguishable from that. First of all, I just want to say, not that I think the case poses a problem for us, but it is a case from the D.C. Circuit. I agree, it's not binding. It's intention with Begg, you have to follow Begg. But it's not a problem for us because there was no alleged linkage between the bailment agreement in DeSeppel and the Hungarian Nazi allied expropriation. I mean, I guess maybe I just disagree with you because it seems to me that in discussing the alleged expropriation in the same paragraph as the bailments, that the court is saying that the bailment agreement resolved the expropriation or at least that that is what was being alleged by Hungary. Absolutely not, not by the plaintiff. Hungary's argument doesn't matter. The argument is what the plaintiff claimed. The plaintiff did not claim that the bailment agreement resolved the expropriation. The plaintiff alleged that the bailment agreement stood alone. Here, this plaintiff alleges that the settlement agreement, the alleged oral settlement agreement was to compensate for the expropriation. As I said before, that brings you right within the ambit of Begg. As Magistrate Judge Torres said, this case is exactly like Begg. And it was on that basis that Judge Williams correctly adopted the report and recommendation. An alleged agreement to settle a uniquely sovereign expropriation is not commercial activity within the meaning of the FSIA. And for that reason, the judgment below should be affirmed. Seem like time is up, so if there's no further questions, thank you very much for your time. All right, thank you, counsel. We'll hear from Mr. Harrison. The U.S. Supreme Court's 1992 decision in Weltover, Argentina involved the distinctly sovereign activity of a sovereign addressing a domestic credit crisis. And the court said, quote, it is irrelevant why Argentina participated in the bond market in the manner of a private actor. It matters only that it did so, period, end quote, page 617. That again, though, goes to, and let me get back to the commercial versus based on inquiry. That goes to the commercial inquiry. But for the based on inquiry, is it your argument that we don't consider what the underlying reason was? That is also applicable, expressly so, to the based upon inquiry. And where would you point me to? I would point you to that case, Weltover, and also to Sachs and Nelson, which discuss exactly the gravamen, the core, the based upon. Some of the language that your honor likewise used in Devon Goetia, when looking to see whether or not the commercial activity falls within the FSIA exception. It is here, the gravamen and core of this lawsuit, that Angola breached a settlement agreement. That is the claim that we bring. We are the masters of our complaint, as Deciple notes. That is the claim, and that is what needs to be proved for us to prevail. This is not about the 2016, denied by Angola, seizure as expropriation. This is about the 2019 settlement of a piece of litigation, as well as other conduct, like the lobbying that was taking place that was so oppressive to Angola. This court's commercial activity breach of contract cases, where there actually is a breach of contract considered, uniformly find commercial activity, and that the lawsuit is based upon that commercial activity, when a breach of contract and unjust enrichment claim is brought, which is a major point of distinction from BEG, one sidestepped by Angola in its briefs, and here. Likewise, Judge Wilson, your first question, where you asked, is there any other breach of settlement agreement case, where conduct is under, with a sovereign, that was found not to be commercial activity, you did not get one. That's because there is not one. Every case so finds. Fontana, Mote, Fagan, Figueroa, and Lorde, Day, and Lorde. Every single case so finds. As to the DeCepel case, which Judge Rosenbaum and Devon Goenchea really does embrace and does analyze, important point, I think, is, what? It's actually a later opinion in the DeCepel series, but. The question is, what analysis did the court bring to the question? And in analyzing this question of contract, versus background expropriation, years before, much like what we have here, DeCepel and Devon Goenchea, in its discussion of DeCepel, come out squarely on, in a breach of contract case like this one, the suit is based upon commercial activity, and if there is direct effects in the U.S., as there is here, with the non-payment of $47.5 million into a Miami bank account, that qualifies for subject and personal jurisdiction under the FSIA. We urge the court to reverse. Judge. I mean, it doesn't have anything to do with the case, but why is this case in the Southern District of Florida? The context that led to the settlement discussions that took place in Lisbon, Portugal, took place from and to the Southern District of Florida, and in terms of venue, this court looks to omissions and events. The key omission, of course, is Angola's obligation to pay the $47.5 million into the Florida bank account, which it failed to do, under weltover for FSIA jurisdiction direct effects in the U.S. purposes, that is an important omission and contact, indeed a critical one, which leads us to the Southern District of Florida, where Miami is based. But you didn't amend the complaint in the D.C. court, did you, or the D.C. action, when you could have? That's correct, we did not. That was a different case. It was well along the line. We decided to bring our breach of contract case in an appropriate court, a new court, and within six days of doing so, notified the D.C. Circuit. Of course not. The D.C. District Court. District Court here could have determined that this was a forum non-convenience, though, couldn't it? That argument was not raised below, and I think that certainly if it had been, that would be rejected. This is not an inconvenient forum. It is an appropriate forum. It is a forum that had contacts. And of course, if there were a venue issue, the appropriate remedy would not be dismissal. It would be transferred to D.C. under the statute. But this is an appropriate venue, properly brought with notice to the D.C. court. Gotcha. Thank you. Thank you, counsel. And the court will be in recess for 15 minutes.